No.  13-3499

---

IN THE

# United States Court of Appeals

### FOR THE SIXTH CIRCUIT

---

LEMARCO, INC., *et al*,

*Petitioners,*

v.

NANCY HELTON

and

DIRECTOR, OFFICE OF WORKERS' COMPENSATION PROGRAMS,
UNITED STATES DEPARTMENT OF LABOR,

*Respondents.*

---

ON PETITION FOR REVIEW OF A DECISION
AND ORDER OF THE BENEFITS REVIEW BOARD,
UNITED STATES DEPARTMENT OF LABOR

---

**PETITIONERS' BRIEF**

---

Mark E. Solomons
Laura Metcoff Klaus
GREENBERG TRAURIG LLP
2101 L Street, N.W., Suite 1000
Washington, D.C. 20037
(202) 533-2361

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

# Disclosure of Corporate Affiliations
# and Financial Interest

Sixth Circuit
Case Number: 13-3499    Case Name: Lemarco, Inc. et al. v. Helton, et al.

Name of counsel: Laura Metcoff Klaus

Pursuant to 6th Cir. R. 26.1, Lemarco, Inc. and Old Republic Insurance Co.
*Name of Party*
make the following disclosure:

1.    Is said party a subsidiary or affiliate of a publicly owned corporation? If Yes, list
      below the identity of the parent corporation or affiliate and the relationship
      between it and the named party:

      Yes. Old Republic Insurance Company is a wholly owned subsidiary of the Old
      Republic International Group.

2.    Is there a publicly owned corporation, not a party to the appeal, that has a
      financial interest in the outcome? If yes, list the identity of such corporation and
      the nature of the financial interest:

      See above.


CERTIFICATE OF SERVICE

I certify that on July 8, 2013                              the foregoing document was served on all
parties or their counsel of record through the CM/ECF system if they are registered users or, if
they are not, by placing a true and correct copy in the United States mail, postage prepaid, to
their address of record.


s/ Laura Metcoff Klaus


This statement is filed twice: when the appeal is initially opened and later, in the principal briefs,
immediately preceding the table of contents. See 6th Cir. R. 26.1 on page 2 of this form.

6CA-1
8/08                                                                                      Page 1 of 2

STATEMENT IN SUPPORT OF ORAL ARGUMENT

This case presents an important issue of administrative practice and procedure.  Pursuant to Local Rule 34(a), petitioners respectfully request oral argument because they believe that the give-and-take of argument may assist the Court in resolving the issues presented in this case.

# TABLE OF CONTENTS

Page

CIRCUIT RULE 26.1 DISCLOSURE STATEMENT ..................................... i

STATEMENT IN SUPPORT OF ORAL ARGUMENT ................................. ii

TABLE OF AUTHORITIES .......................................................... iii

I.    STATEMENT OF APPELLATE AND
      SUBJECT MATTER JURISDICTION ....................................... 1

II.   STATEMENT OF ISSUES ....................................................... 2

III.  STATEMENT OF THE CASE ................................................. 2

IV.   STATEMENT OF FACTS ....................................................... 7

V.    SUMMARY OF ARGUMENT ................................................. 15

VI.   ARGUMENT ........................................................................ 18

      A.    Standard of Review ....................................................... 18

      B.    The ALJ Resolved Conflicts in the Record by Mischaracterizing
            The Evidence as well as the Conclusions in the
            Preamble .................................................................. 19

      C.    Mrs. Helton's Proof Is Insufficient as a Matter of Law to
            Establish Death Due to Pneumoconiosis ............................. 27

VII.  CONCLUSION ..................................................................... 36

VIII. STATEMENT REGARDING ORAL ARGUMENT

CERTIFICATION OF COUNSEL

## TABLE OF AUTHORITIES

<u>Cases</u>:                                                                          <u>Page</u>

<u>A & E Coal Co. v. Adams</u>,
  694 F.3d 798 (6th Cir. 2012) ................................................................. 16,23,27

<u>Allentown Mack Sales & Serv., Inc. v. NLRB</u>,
  522 U.S. 359 (1998)................................................................................27

<u>Arch of Kentucky, Inc. v. Director, OWCP</u>,
  556 F.3d 472 (6th Cir. 2009) ................................................................17

<u>Best v. Lowe's Home Ctrs., Inc.</u>,
  563 F.3d 171 (6th Cir. 2009)........................................................... 30,32

<u>Bill Branch Coal Corp. v. Sparks</u>,
  213 F.3d 186 (4th Cir. 2000) ................................................................32

<u>Camp v. Pitts</u>,
  411 U.S. 138 (1973)................................................................................26

<u>Clifford v. Apfel</u>,
  227 F.3d 863 (7th Cir. 2000) ................................................................34

<u>Conley v. National Mines Corp.</u>,
  595 F.3d 297 (6th Cir. 2010) ..................................................... 28,29,30

<u>Chrysler Corp. v. Brown</u>,
  441 U.S. 281 (1979)................................................................................26

<u>Daubert v. Merill Dow Pharms., Inc.</u>,
  509 U.S. 579 (1993) ..............................................................................31

<u>Director, OWCP v. Greenwich Collieries</u>,
  512 U.S. 267 (1994)................................................................................18

<u>Director, OWCP v. Rowe</u>,
  710 F.3d 251 (6th Cir. 1983) ....................................................... 20,22

Eastover Mining Co. v. Williams,
     338 F.3d 501 (6th Cir. 2003) ............................................................ 17,28,30,32

Freeman United Coal Min. Co. v. Stone,
     957 F.2d 362(7th Cir. 1992) ............................................................32

Glen Coal Co. v. Seals,
     147 F.3d 502 (6th Cir. 1998) ............................................................17

Greene v. King James Coal Mining, Inc.,
     575 F.3d 628 (6th Cir. 2009) ............................................................20

Guinn v. AstraZeneca Pharms., LP,
     602 F.3d 1245 (11th Cir. 2010) ............................................................31

Gunderson v. Blue Mountain Energy,
     No. 11-0668 BLA (Ben. Rev. Bd. July 30, 2012) ............................................................27

Harman Mining Co. v. Director, OWCP,
     678 F.3d 305 (4th Cir. 2012) ............................................................23

In Re Paoli R.R. Yard PCB Litig.,
     35 F.3d 717 (3d Cir. 1994) ............................................................31

Johnson v. Manitowoc Boom Trucks, Inc.,
     484 F.3d 426 (6th Cir. 2007) ............................................................32

Kolesar v. Youghiogheny & Ohio Coal Co.,
     760 F.2d 728 (6th Cir. 1985) ............................................................17

Lane Hollow Coal Co. v. Director, OWCP,
     137 F.3d 799  (4th Cir. 1998) ............................................................19

Lango v. Director, OWCP,
     104 F.3d 573 (3d Cir. 1997) ............................................................32

Little David Coal Co. v. Director, OWCP,
     No. 11-3574 (6th Cir. July 23, 2012) (unpub.) ............................................................27

McCain v. Director, OWCP,
58 Fed. App'x 184 (6th Cir. 2003) ....................................................34

Meece v. Barnhart,
192 Fed. App'x. 456 (6th Cir. 2006) ...............................................34

Morehead Marine Servs., INc. v. Washnock,
135 F.3d 36600 (6th Cir. 1998) ................................................. 19,36

Morrison-Knudsen Constr. Co. v. Director, OWCP,
461 U.S. 624 (1983) ...........................................................................18

National Mining Assn. v. DOL,
292 F.3d 849 (D.C. Cir. 2002) .........................................................25

Paulsen v. Daniels,
413 F.3d 999 (9th Cir. 2005) .............................................................26

Pietrunti v. Director, OWCP,
119 F.3d 1035 (2d Cir. 1997) ...........................................................34

Potomac Elec. Power Co. v. Director, OWCP,
449 U.S. 258 (1980) ...........................................................................18

Risher v. OWCP,
940 F.2d 327 (8th Cir. 1991) ...................................................... 20,33

Rohan v. Chater,
98 F.3d 966 (7th Cir. 1996) ...............................................................34

SEC v. Chenery Corp.,
318 U.S. 80 (1943) .............................................................................26

U.S. Steel Mining Co., Inc. v. Director, OWCP [Jarrell],
187 F.3d 384 (4th Cir. 1999 ....................................................... 31,34

Walker v. Director, OWCP,
927 F.2d 181 (4th Cir. 1991) ............................................................34

Westberry v. Gislaved Gummi AB,
   178 F.3d 257 (4th Cir. 1999) ............................................................31

Wyeth v. Levine,
   555 U.S. 555 (2009).........................................................................26

Statutes and Regulations:

Administrative Procedure Act,
   5 U.S.C. §§ 551-559, §§ 701-706
      5 U.S.C. § 553(b) ...................................................................... 15,16
      5 U.S.C. § 557(c)(3)(A)....................................................................19
      5 U.S.C. § 556(d) ..................................................................... 26,31
      5 U.S.C. § 559 ..................................................................................19

Black Lung Benefits Act, as amended, 30 U.S.C. §§ 901-945
   Section 401(a), 30 U.S.C. § 901(a) ...................................................27
   Section 422(a), 30 U.S.C. § 932(a) .....................................................1


Longshore Act, as amended, 33 U.S.C. §§ 901-952
   Section 21(b), 33 U.S.C. § 921(b)........................................................1
   Section 21(c), 33 U.S.C. § 921(c) .......................................................1

Black Lung Benefits Act of 1972, 86 Stat. 150 .........................................1

Black Lung Benefits Reform Act of 1977, 92 Stat. 95.................................1

Black Lung Benefits Revenue Act of 1977, 92 Stat. 11 ..............................1

Black Lung Benefits Revenue Act of 1981, and the Black Lung Benefits
   Amendments of 1981, 95 Stat. 1635 ...................................................1

Consolidated Omnibus Budget Reconciliation Act of 1985, Pub. L. No. 99-272,
   100 Stat. 312, 313 (1986) ....................................................................1

Omnibus Reconciliation Act of 1987, Pub. L. No. 100-203,
   101 Stat. 1330 (1987) ...........................................................................1

Patient Protection and Affordable Care Act,
    Pub. L. No. 111-148 (March 23, 2010) ...................................................................1


Black Lung Program Regulations

    20 C.F.R. § 718.201(a)(1) ...................................................................3
    20 C.F.R. § 718.201(a)(2) ...................................................................3
    20 C.F.R. § 718.201(b)........................................................................3
    20 C.F.R. § 718.205(c) ....................................................................3,28
    20 C.F.R. § 718.304..........................................................................28

    68 Fed. Reg. 69932 (Dec. 15, 2003)..................................................25
    68 Fed. Reg. 69930 (Dec. 15, 2003)............................................. 25,26
    65 Fed. Reg. 79949-51 (Dec. 20, 2000)...........................................35
    65 Fed. Reg. 79939-40 (Dec. 20, 2000)...........................................23
    65 Fed. Reg. 79938 (Dec. 20, 2000) ................................................25
    65 Fed. Reg. 79937-45 (Dec. 20, 2000)...........................................24
    65 Fed. Reg. 79923 (Dec. 20, 2000) ................................................24


Miscellaneous

Marine, "Clinically Important Respiratory Effects of Dust Exposure and Smoking in
    British Coal Miners," 137 AM. REV. OF RESPIRATORY DISEASE 106 (1988)....23,24

Miller & Rein, "'Gatekeeping' Agency Reliance on Scientific and Technical
    Materials After Daubert: Ensuring Relevance and Reliability in the
    Administrative Process," 17 TOURO L.REV. 297 (2000) .................................. 32

NIOSH, CRITERIA FOR A RECOMMENDED STANDARD: OCCUPATIONAL
    EXPOSURE TO RESPIRABLE COAL MINE DUST (1995) ...........................................12

I. <u>STATEMENT OF APPELLATE AND SUBJECT MATTER JURISDICTION</u>

This case is before the Court on an appeal by Lemarco, Inc. and Old Republic Insurance Company (collectively "Lemarco"), from an award of benefits under the Black Lung Benefits Act ("BLBA").[1]  30 U.S.C. §§ 901-945.  The final decision and order of the Benefits Review Board ("Board"), United States Department of Labor, was issued on March 1, 2013. Appendix ("Apx.") 7. In that decision, the Board declined to reconsider its earlier decision and order, issued on September 26, 2012, affirming an administrative law judge's award of benefits. The decision and order of the administrative law judge ("ALJ") was issued on August 23, 2011. Apx. 17. The Board had jurisdiction to consider the appeal because it was filed within the thirty-day period provided in 33 U.S.C. § 921(b), <u>incorporated by reference into</u> 30 U.S.C. § 932(a).

On April 23, 2013, this Court docketed Lemarco's petition for review of the Board's final order.  The appeal is timely.  33 U.S.C. § 921(c), <u>incorporated by reference into</u> 30 U.S.C. § 932(a).  The miner that is the subject of this appeal, Wayne Helton, last worked as a coal miner for Lemarco, Inc. in the Commonwealth of Kentucky. Dx. 4.[2]  This Court thus has both appellate and subject matter jurisdiction to consider this appeal.

---

[1]    Part C of Title IV of the Federal Coal Mine Health and Safety Act of 1969, as amended by the Black Lung Benefits Act of 1972, 86 Stat. 150, and as further amended by the Black Lung Benefits Reform Act of 1977, 92 Stat. 95, the Black Lung Benefits Revenue Act of 1977, 92 Stat. 11, the Black Lung Benefits Revenue Act of 1981, and the Black Lung Benefits Amendments of 1981, 95 Stat. 1635, Consolidated Omnibus Budget Reconciliation Act of 1985, Pub. L. No. 99-272, 100 Stat. 312, 313 (1986), the Omnibus Reconciliation Act of 1987, Pub. L. No. 100-203, 101 Stat. 1330 (1987), and the Patient Protection and Affordable Care Act, Pub. L. No. 111-148, § 1556 (March 23, 2010).

[2]    Evidence that is not included in the appendix is designated as follows: "Dx." refers to an exhibit of the Director, OWCP, followed by the exhibit number

## II.  STATEMENT OF THE ISSUES

A.    Does the preamble to the Department of Labor's regulations constitute substantial evidence supporting an award of benefits when that is the sole basis for the ALJ's decision.

B.    Is the ALJ's award consistent with law where the only medical opinion suggesting a relationship between Helton's death and his coal mine employment consists of a single unexplained sentence.

## III.  STATEMENT OF THE CASE

This case involves a claim for survivor's benefits under the BLBA.  The claimant, Nancy Helton filed for benefits on July 9, 2004, three weeks after Wayne Helton's death.  Dx. 2, Apx. 145: Dx. 17.  After the Department of Labor ("DOL") processed the claim, the case proceeded to the Office of Administrative Law Judges for a hearing.  Dx. 46.  That hearing took place on May 8, 2007.

On April 29, 2008, an ALJ issued a decision awarding the claim.  Apx. 42 : ALJ Decision & Order ("D&O).  The ALJ analyzed Mrs. Helton's entitlement under DOL's permanent regulations at 20 C.F.R. Part 718.  Apx. 44: ALJ D&O at 3.  Under those rules, the claimant bears the burden of proving that:  (1) the miner had pneumoconiosis;  (2) the disease arose out of the miner's coal mine employment; and (3) the miner's death was due to pneumoconiosis.  20 C.F.R. § 718.205(c).  Because Mr. Helton had established coal workers' pneumoconiosis in his prior claim, the ALJ found that Lemarco was collaterally estopped from relitigating it in Mrs. Helton's case.  Apx. 46: ALJ D&O at 5.  Therefore, the only issue that required resolution was the cause of Helton's death.  No presumption assists in this inquiry.  The proof must establish, by competent medical evidence,

---

assigned to it at the hearing. "Ex." refers to an employer's exhibit, "Cx." refers to a claimant's exhibit, and "Tr." refers to the hearing transcript followed by the date of the hearing and the page number on which the cited material appears.

that pneumoconiosis either caused or substantially contributed to death.  20 C.F.R. § 718.205(c).

The ALJ concluded that a one-sentence letter from Helton's treating doctor, Dr. Eubank, satisfied this standard. Apx. 53: ALJ D&O at 12.  She discredited any contrary opinion as unsupported by the treatment notes.  Apx. 54: ALJ D&O at 13.  The Board vacated this decision because there was a mismatch between the type of pneumoconiosis established in Helton's claim (clinical pneumoconiosis[3]) and the type of pneumoconiosis, the ALJ relied on when she credited Dr. Eubank's opinion (legal pneumoconiosis[4]).   The Board instructed the ALJ to consider whether the evidence established that Helton had legal pneumoconiosis and then determine whether Helton's death was due to clinical or legal iosis.  Apx. 11, 12: BRB D&O at 4, 5.  When the case returned to the ALJ, Lemarco requested that she provide notice if she intended to rely on the preamble to the Department's regulations, what provisions she intended to consider, and an opportunity to respond with proof.  The ALJ ignored this request.

Two years later, the ALJ issued a decision on remand, again awarding benefits.  The ALJ announced that she relied on certain "principles" set out in DOL's preamble to regulations adopted by DOL in 2001, to assess the evidence, stating:

---

[3]    "Clinical" or "medical" pneumoconiosis is defined as "those diseases recognized by the medical community as pneumoconiosis."   20 C.F.R. § 718.201(a)(1).  It is diagnosed by x-ray, biopsy or autopsy evidence.

[4]    "Legal" pneumoconiosis is defined as "any chronic lung disease or its impairment and its sequelae arising out of coal mine employment."  20 C.F.R. § 718.201(a)(2).  Despite its misleading name, it is a medical condition that is diagnosed by medical experts, not by lawyers and judges.  The term "arising out of coal mine employment" is defined as a disease or impairment "significantly related to, or substantially aggravated by, dust exposure in coal mine employment."  Id., § 718.201(b).

The Department of Labor has taken the position that coal dust exposure may induce obstructive lung disease even in the absence of fibrosis or complicated pneumoconiosis. This underlying premise was stated explicitly in the commentary that accompanied the final version of the current regulations:

> … Whether coal mine dust exposure can cause chronic obstructive pulmonary disease is a question of medical and scientific fact that will not vary from case to case; thus, it is an appropriate question for the Department to answer by regulation. … The revised definition will eliminate the need for litigation of this issue on a claim-by-claim basis, and render invalid as inconsistent with the regulations medical opinions which categorically exclude obstructive lung disorders from occupationally-related pathologies. The Department reiterates, however, that the revised definition does not alter the former regulations' …requirement that each miner bear the burden of proving that his obstructive lung disease did in fact arise out of his coal mine employment, and not from another source….

The Department concluded that "[e]ven in the absence of smoking, coal mine dust exposure is clearly associated with clinically significant airways obstruction and chronic bronchitis. **The risk is additive with cigarette smoking**." Citing to studies and medical literature reviews conducted by NIOSH, the Department quoted the following from NIOSH:

> … COPD may be detected from decrements in certain measures of lung function, especially FEV1 and the ratio of FEV1/FVC. **Decrements in lung function associated with exposure to coal mine dust are severe enough to be disabling in some miners, whether or not pneumoconiosis is also present.**…

Moreover, the Department concluded that the medical literature "support[s] the theory that dust-induced emphysema and smoke-induced emphysema occur through similar mechanisms." Medical opinions which are based on the

4

premise that coal dust-related obstructive disease is completely distinct from smoking-related disease, or that it is never clinically significant, are therefore contrary to the premises underlying the regulations. On the other hand, while the Department concluded that medical studies have found a significant decrement in coal miners' pulmonary function in addition to that caused by smoking, the regulations require that the issue of whether a miner's disability is due to coal mine employment or smoking must be resolved on a claim-by-claim basis. The burden of proof remains on the miner to show that his obstructive lung disease arose out of his coal mine employment.

Apx. 29-30: ALJ D&O at 13-14 (footnotes omitted) (emphasis in original). None of these so-called principles is part of a regulation and none were evaluated by an expert in connection with Mr. Helton's health.

The ALJ acknowledged that although Helton's treatment records contained a diagnosis of chronic obstructive pulmonary disease ("COPD"), none of the records addressed whether coal dust exposure contributed to Helton's pulmonary or respiratory problems and to the extent any doctor attributed a source to Helton's COPD, that doctor mentioned only cigarette smoking. Apx. 30: ALJ D&O at 14. The litigation opinions conflicted and the ALJ declared: "All of the doctors' opinions given in connection with this claim were flawed." Apx. 31: ALJ D&O at 15. For example, the doctors who declared that Helton's COPD was due to coal mine employment failed to address the role of Helton's cigarette smoking. The ALJ nevertheless decided that their diagnoses of legal pneumoconiosis were sufficient to satisfy Mrs. Helton's burden of proof because their opinions were "consistent with the premises underlying the regulations that coal dust can cause obstructive disease even in the absence of clinical pneumoconiosis or smoking." Apx. 31-32: ALJ D&O at 15-16. See also Apx. 31: ALJ D&O at 15 ("In view of the consensus of medical opinion that smoking and coal dust exposure have

additive effects," their opinions were entitled to "some weight … as they were consistent with the premises underlying the regulations regarding the role of coal dust exposure in causing obstructive disease in miners.").

The ALJ discredited two contrary opinions, notwithstanding the doctors' expertise, because one opinion, by Dr. Rosenberg, was "not consistent with the premises underlying the regulations that coal dust can cause clinically significant obstructive disease even in the absence of clinical pneumoconiosis or smoking" and he did not seem to recognize that Helton had obstructive lung disease before he developed congestive heart failure when he attributed Helton's obstructive disease to congestive heart failure. Id. She discredited a second opinion, by Dr. Vuskovich, because he did not explain why coal dust was not a contributing factor so "his opinion, too, is contrary to the premises underlying the regulations, that coal dust and smoking have additive effects." Id. She additionally claimed, inaccurately, that he did not believe that Helton had cor pulmonale when all of the cardiologists agreed that he did. Id. See also Apx. 32: ALJ D&O at 16.

The ALJ then found that the evidence established that Helton's death was due to pneumoconiosis. She declared that Dr. Eubank's opinion was supported by the treatment records and the death certificate, but the opinions of Drs. Vuskovich and Rosenberg were not. Apx. 33: ALJ D&O at 17.

The Benefits Review Board affirmed this decision following Lemarco's timely appeal. Apx. 8: BRB D&O dated September 26, 2012. The Board decided that "the administrative law judge had discretion to consult the preamble to the regulations as an authoritative statement of medical principles accepted by the Department of Labor (DOL) when it revised the definition of pneumoconiosis to include obstructive respiratory or pulmonary impairments arising out of coal dust exposure." Apx. 12: BRB D&O at 5. According to the Board, the ALJ was not required to give notice of her intention to rely on the preamble because it was not

evidence.  Id.  The Board then affirmed the ALJ's findings in all respects, noting that the ALJ correctly decided that Dr. Eubank's three years of treatment excused any lack of explanation in her opinion and permissibly discredited the contrary opinions. Apx. 14, 15: BRB D&O at 7 & n.6, 8.

When the Benefits Review Board declined to reconsider this decision, this timely appeal followed.   Apx. 1, Apx. 7: BRB March 1, 2013 Order on Reconsideration.

## IV.  STATEMENT OF FACTS

Wayne Helton worked as a miner for approximately thirteen years, from 1973 to 1989.  Apx. 20: ALJ D&O at 4.  While he worked and after he retired, he abused tobacco, alcohol and pain killers.  Helton began smoking cigarettes in 1966, and continued smoking, off and on, until at least December 2003.  See Apx. 124, 125, 126: Dx. 19-17, 19-18; Apx. 68: Cx. 5 at 1.  In 2003 and 2004, he reported that he smoked cigarettes for thirty or forty-five years, one-half package daily. Apx. 125, 126: Dx. 19-17, Dx. 19-18.  Although the ALJ stated that the treatment notes provided the most reliable account of Helton's smoking habit, she did not credit the history reported in those notes.   She concluded that Helton had a smoking habit of twenty to twenty-two pack-years.  Apx. 20: ALJ D&O at 4.  He developed pulmonary and left-sided coronary problems and died on June 17, 2004, at age sixty-six.  Apx. 145: Dx. 17.

Helton filed a claim for federal black lung benefits in October 1991, and after bouncing back and forth between the Department of Labor's Office of Administrative Law Judges and the Benefits Review Board, his claim was awarded.  Apx. 56, 57, 118.  He proved to an ALJ's satisfaction that he had clinical pneumoconiosis and that he was totally disabled due to it.  No doctor definitively diagnosed COPD, let alone disabling COPD, and therefore no doctor related such a condition to Helton's coal mine employment.  Apx. 63-66.

The evidence submitted by the parties in Mrs. Helton's claim included Helton's death certificate, treatment notes and medical reports prepared for this litigation or Mr. Helton's prior claim.

Mrs. Helton relied on an opinion from Dr. W.F. Clarke, who examined Helton on May 15, 1990.  Apx. 68: Cx. 5.  Although Helton told the doctor that he had been smoking one package of cigarettes daily for twenty years, the doctor stated that Helton "gave no other history of etiology for his type of dyspnea" other than his work as a miner for seventeen years.  Dr. Clarke also reported findings on physical examination that no other doctor reported.  He reviewed an x-ray, and pulmonary function tests, later deemed invalid, and declared that Helton was "totally and permanently disabled for all work in a dusty environment and all manual labor" due to his x-ray evidence of pneumoconiosis.  Apx. 69: Cx. 5 at 2. But see Apx. 73: Ex. 4 at 3 (invalidating Dr. Clarke's pulmonary function tests as unreliable due to lack of effort).

Treatment records begin in May 1993, when Helton saw Dr. J.D. Miller.  He reported that he had osteoarthritis, hyperlipidemia, coal workers' pneumoconiosis, decreased vision, and dentures.  A chest x-ray was normal except for compression fractures of healed rib fractures.  Dr. Miller stated that the diagnosis of coal workers' pneumoconiosis was made elsewhere, but was corroborated by pulmonary function testing done by Dr. Baker in 1991.  Apx. 114: Dx. 19-7.  But see Apx. 74: Ex. 4 (invalidating Dr. Baker's test).

After a seven-year hiatus, where the only treatment was for nose bleeds in October 1994 (Dx. 15-105), and a head injury following a fall in April 2000 (Dx. 15-4), Dr. Rachel Eubank began seeing Helton every three months beginning in August 2001.  Each time, she diagnosed hypertension and osteoarthritis as well as "COLD," a diagnosis she repeated, without explanation until February 12, 2004, when her notes state "COLD--has WC for this and is based on mining."  Apx. 128:

8

Dx. 19-21, Apx. 134: Dx. 19-27, Apx. 137: Dx. 19-30.  Beginning in December 2003, and continuing through May 2004, she diagnosed "tobacco use disorder" and commented that Helton was a "current smoker" with symptoms of nicotine addiction, who either desired to quit or had quit recently.  Apx. 124, 125, 128, 133, 134: Dx. 19-17, 19-18, 19-21, 19-26, 19-27.  In January 2004, Dr. Eubank added cor pulmonale to the list of diagnoses.  Apx. 126: Dx. 19-19.  A notation of congestive heart failure first appeared on May 12, 2004.  Apx. 135: Dx. 19-28.  During that visit, the doctor also noted that Helton was "using too many pain pills."  Id.  At no time do the treatment notes mention cor pulmonale with right sided congestive heart failure.

Helton was hospitalized between May 19-21, 2004, with progressive shortness of breath and edema.  Dr. Eubank described his condition as positive for COPD, noting "[h]e was on workman's compensation based on years of mining.  He has now been retired for years and he has recently quit smoking," She also diagnosed cor pulmonale related to his lung problems, hypertension, and osteoarthritis for which he used pain pills regularly, in increasing amounts over the last few years.  Apx. 146: Dx. 16-98.  Although x-rays from May 19, 2004, showed marked cardiomegaly, they did not show overt signs of congestive heart failure.

Dr. Eubank consulted Dr. Khaled Saleh who noted a history of a left bundle branch block disclosed on an electrocardiogram in January 2004.   He also commented on Helton's smoking habit of at least one-half package daily for forty-five years, and stated:  "The patient has long history of tobacco abuse.  It is not clear if the COPD is prednisone responding or not, this will be discussed in detail with Dr. Eubank."  Apx. 157, 160: Dx. 15-99, 15-102.

On May 20, 2004, Dr. Eubank consulted Dr. Vishwanath Halukurike, a nephrologist, for acute renal failure and other problems.  Apx. 153: Dx. 15-94.  He noted Helton's history of COPD, commenting that "[t]he patient smokes

significantly for a very long time," tobacco abuse, past head injury, degenerative joint disease, hypertension, and a history of "left bundle branch block causing wide complex tachycardia."  At most, he suspected possible cor pulmonale.  Id.  After reviewing Helton's treatment and symptoms, test results and examining Helton, Dr. Halukurike disagnosed: "Chronic obstructive pulmonary disease vs. congestive heart failure vs. cor pulmonale exacerbation at this point causing shortness of breath." Apx. 155: Dx. 15-96.  He also diagnosed acute and chronic renal failure, hyperkalemia, metabolic acidosis, and "high LFT's" possibly due to chronic passive congestion of the liver parenchyma secondary to possibly right heart failure" or Helton's use of Tylenol No. 3.  Finally, he noted hyponatremia, which he related to "combination of hypovolemic state with congestive heart failure, along with increased forward flow, having high ADH levels,… worsened by the Maxzide combination."  He commented:  "The diuretics have an increased propensity to cause hyponatremia." Id.

Catheterization on May 21, 2004, disclosed left heart failure.  Apx. 161: Dx. 14-176, Apx. 143: Dx. 19-49.  Dr. Eubank also diagnosed:

1. Chronic obstructive pulmonary disease with cor pulmonale.
2. Cardiac arrhythmia, tachycardia and cardiomegaly.
3. Hypotension.
4. Acute renal failure.
5. Electrolyte imbalance with hyponatremia and hyperkalemia.
6. Hepatic congestion secondary to poor cardiac function.
7. Osteoarthritis.

Apx. 147: Dx. 16-99, Apx. 152: 15-18.  By May 21, 2004, a chest x-ray disclosed clear lungs, and mild cardiomegaly, again with no overt signs of congestive heart failure.  Dx. 15-77, 15-78, 15-79, 15-82.

Dr. Eubank also consulted Dr. Haas on May 24, 2004, for Helton's elevated liver enzymes.  She noted that Helton's past medical history was remarkable for

alcohol abuse and EtOH induced cardiomyopathy, a history of COPD, degenerative joint disease, hypertension, bundle branch block and chronic renal insufficiency.  She commented that he "is a smoker as well as a user of alcohol in the past."  Apx. 164: Dx. 14-170. The doctor believed that Helton's abnormal liver function was likely related to a combination of ischemic hepatitis and congestive heart failure for which she recommended aggressive treatment and monitoring. Apx. 165: Dx. 14-171.

Helton was transferred to another hospital between May 26, and June 7, 2004, for further work-up.  Apx. 148: Dx. 16-6.  Dr. Rahman reported "acute-on-chronic renal failure," hyponatremia which "could be secondary to congestive heart failure," hyperkalemia, congestive heart failure, chronic obstructive pulmonary disease, "possible cor pulmonale" and mild anemia.  Apx. 162: Dx. 14-178.  Dr. Qazi reported that an echocardiogram disclosed an ejection fraction of 10% with severe mitral and tricuspid regurgitation.  Apx. 161: Dx. 14-176.  On discharge he reported a poor prognosis and found Helton was not a candidate for invasive cardiac surgery.  He diagnosed ethanol induced cardiomyopathy, COPD, hepatitis C, congestive heart failure, hypertension, hyponatremia, hyperkalemia, degenerative joint disease and chronic renal insufficiency.  Apx. 148: Dx. 16-6.

The record contains no treatment records at the time of Helton's death, and no autopsy was performed.  Dr. Eubank completed the death certificate and identified the cause of death as congestive heart failure due to cor pulmonale, due to COPD.  She listed severe osteoarthritis as another condition contributing to, but not resulting in the underlying cause of death.  Apx. 109: Dx. 19-2.

Several months after Helton's death, on August 4, 2004, Dr. Eubank wrote a note "to whom it may concern regarding the patient has CWP which caused Cor Pulmonale and CHF leading to his demise."  Apx. 141: Dx. 19-34.  The next day, Dr. Eubank wrote a letter "to whom it may concern," stating:

> Mr. WAYNE HELTON who died 06/17/2004 had COLD due to CWP and Cor Pulmonale as a result of this which caused Cardiomyopathy and Congestive heart failure leading to his death.

Apx. 144: Dx. 17-1.  Dr. Eubank's qualifications are not alleged.

Dr. David Rosenberg reviewed these records.  Apx. 101: Dx. 20, Apx. 98: Ex. 1, Apx. 78: Ex. 3.  He considered Helton's work and smoking histories as well as his "history of heavy alcohol intake with resultant cardiomyopathy, and … chronic pain medications."  He noted that in Helton's last hospitalization, doctors found marked cardiac dysfunction with both left and right-sided heart failure, sepsis with renal insufficiency and hyponatremia, but his X-rays revealed no micronodularity with the presence of cardiomegaly. Apx. 105: Dx. 20-7.

The doctor explained:  "There is no question that coal mine dust exposure can cause chronic airflow obstruction."  But the studies showed that absent progressive massive fibrosis, coal mine dust exposure does not cause the type of significant reduction in $FEV_1\%$ (*i.e.*, the ratio of $FEV_1$/FVC) that Helton's tests showed.  Helton's numbers were more consistent with a non-coal mine dust induced obstruction, where the $FEV_1\%$ is reduced with air trapping.  Apx. 106: Dx. 20-8.  See also Apx. 99: Ex. 1 at 2 (citing NIOSH, CRITERIA FOR A RECOMMENDED STANDARD:  OCCUPATIONAL EXPOSURE TO RESPIRABLE COAL MINE DUST § 4.2.2.3.2 (1995) and GLOBAL INITIATIVE FOR CHRONIC OBSTRUCTIVE PULMONARY DISEASE). The fact that Helton's severe obstruction occurred on a background of clear lung fields reinforced Dr. Rosenberg's opinion.  He believed that "[u]ndoubtedly," Helton's COPD was" related to his long smoking history."  Apx. 107: Dx. 20-9.

As for Helton's death, Dr. Rosenberg explained that Helton's cardiomyopathy was causing biventricular failure, starting on the left side, with severely reduced left ventricular ejection fraction that caused right-sided heart failure and led to his pulmonary hypertension.  He believed Helton's cor

pulmonale was due to alcoholic related cardiomyopathy, but it "was not caused, hastened or potentiated by coal dust exposure." Nor was Helton's decreased cardiac perfusion to his kidneys or sepsis from an infected gall bladder caused or hastened by coal mine dust exposure. He found it was due to Helton's cardiomyopathy. Dr. Rosenberg noted that chronic pain medication also can cause renal insufficiency. He concluded:

> … Mr. Helton did not have CWP, either of the medical or legal variety. While he presumably had disabling obstructive lung disease, this related to his long smoking history, which continued right up until the terminal portion of his life. His death was related to a cardiomyopathy which was alcohol-induced, and this cardiac condition caused decreased perfusion to other organs, including his kidneys. Also, he had sepsis and renal insufficiency, which were not caused or hastened by coal dust exposure. His death would have occurred when it did, in a similar fashion, irrespective of the past employment he held.

Apx. 107: Dx. 20-9.

Dr. Rosenberg then reviewed the opinions and data from Mr. Helton's claim. Apx. 78: Ex. 3. He confirmed that Helton's death occurred independent of his disabling CWP. Id. See also Apx. 99: Ex. 1 at 2. He explained, with reference to the literature, the mortality of each of the risk factors present in Helton's case wholly apart from his coal dust exposure and CWP which pointed to a prognosis for survival "reduced to nil." Apx. 80: Ex. 3 at 3.

Dr. Rosenberg is well-qualified to render such an opinion. He is board-certified in internal medicine, pulmonary disease, and occupational medicine, Director of Occupational Medicine for the University Hospitals Health System and Assistant Clinical Professor at Case Western Reserve University School of Medicine. He also is a medical advisor in pulmonary disease to the Social Security Administration, and the Ohio Industrial Commission, and was Member of the

13

Occupational Lung Disease Committee of the American College of Occupational and Environmental Medicine. He has lectured extensively on pulmonary medicine and has numerous publications in the field. Dx. 20-10 to 20-15.

Finally, Dr. Matthew Vuskovich reviewed the medical records and Helton's work and smoking histories. Apx. 84: Ex. 2, Apx. 71: Ex. 4. Dr. Vuskovich noted that for ten years, Helton was taking narcotic combination drugs, and with his past alcohol use with depression and anxiety, he was likely to become addicted to or develop a tolerance of narcotics. Apx. 88-89: Ex. 2 at 5-6. Nevertheless, his doctor increased his pain medications and dose of acetaminophen, which led to renal failure and liver toxicity that was evident as early as 2000, but ignored. Apx. 93: Ex. 2 at 10. Cardiomyopathy can be caused by alcohol and drug abuse or renal failure and by May 2004, Helton developed acute cardiomyopathy, not caused by chronic cor pulmonale, a conclusion confirmed by his review of the chest x-rays. Apx. 89, 91: Ex. 2 at 6, 8. Dr. Vuskovich did not believe that Helton had cor pulmonale in the absence of any pulmonary artery system dilatation, defining cor pulmonale as right ventricular enlargement. Apx. 93, 95: Ex. 2 at 10, 12. Helton's x-rays disclosed that he had global heart failure; right ventricular enlargement was never described. Apx. 95: Ex. 2 at 12.

Dr. Vuskovich also pointed out that as a cigarette smoker for many years, Helton was at risk for developing COPD. Apx. 93: Ex. 2 at 10. He acknowledged that coal miners also may develop COPD even in the absence of x-ray evidence of pneumoconiosis, but in Helton's case, his exposure ended while he continued to smoke cigarettes, so any progression of his disease resulted from smoking rather than his remote coal dust exposure. Apx. 94-95: Ex. 2 at 11-12. Dr. Vuskovich concluded that Helton's death "was caused by taking too many pain pills" and that alcohol poisoning caused cardiomyopathy, renal and liver failure. He explained

14

that occupational coal dust exposure was not a factor.    According to Dr. Vuskovich,

> after he developed kidney failure, liver failure, and heart failure, he was going to die quickly from these consequences of drug and alcohol poisoning.    Coal workers' pneumoconiosis, occupational coal dust exposures, and COPD did not hasten his death.

Apx. 95: Ex. 2 at 12.    See also Apx. 96: Ex. 2 at 13, Apx. 76: Ex. 4 at 6.    Dr. Vuskovich is board-certified in occupational medicine, and is an assistant professor of medicine at the University of South Florida.

## V.  SUMMARY OF ARGUMENT

There is nothing right about the ALJ's decision in this case.    She made up the evidence, and made up the law, applied her own medical expertise and in the end, came to rest on the Department of Labor's controversial regulatory preamble. The preamble purports to express the Department's scientific evaluation of the rulemaking record, but it does no such thing.    It was written by the Department's lawyers with no help from its statutory medical advisor for the black lung program (the National Institute of Occupational Safety and Health).    No relevant scientist ever saw the preamble and it was never published for notice and comment in accordance with the Administrative Procedure Act ("APA"), 5 U.S.C. § 553(b).    It cannot, therefore, serve as a source of criteria with the force and effect of law and should not count as a source of medical knowledge.

The ALJ here took reliance on the preamble to a new level.    She applied it to her mischaracterized evidence in ways not contemplated by any proper authority. Knowing that this ALJ always relies almost exclusively on her own interpretation of the preamble, the employer timely requested an opportunity to confront her use of it, but the ALJ ignored that request.    A fair hearing is impossible and it did not

occur in this case.  Nothing is supported by the record, nothing is supported by law and nothing is supported by science.  However much the Court awards benefits in this black lung program, this one is not supported by any relevant or valid evidence.  It reflects nothing but the ALJ's determination to make an award where the evidence does not justify it.

In <u>A&E Coal Co. v. Adams</u>, 694 F.3d 798 (6th Cir. 2012), this Court held that an ALJ does not violate the APA by consulting a preamble so long as the ALJ does not treat it as binding.  This Court did not and could not approve giving the force and effect of law to the preamble.  The APA and all the case law prohibit such a practice where that preamble was not published for notice and comment under 5 U.S.C. § 553(b).

Here, the ALJ did not require Mrs. Helton to prove that Mr. Helton's coal dust exposure significantly contributed to or substantially aggravated his obstructive pulmonary disease by reliable, probative and substantial evidence.  She acknowledged that the two medical opinions in the record that suggested any connection between Helton's COPD and his coal mine employment were "flawed" (an understatement at best).  She nevertheless relied on these flawed opinions because they were consistent with the preamble.  Thus here, unlike <u>Adams</u>, the preamble was dispositive.  The ALJ weighed the evidence based on selected "principles" in the preamble and credited the opinions that declared that Helton had legal pneumoconiosis because they were consistent with these principles.  Apx. 29-30, 31: ALJ D&O at 13-14, 15.  The ALJ then announced that the contrary opinions were "not consistent with the premises underlying the regulations" even though no doctor expressed a view that was inconsistent with the preamble or DOL's regulations.  Although the regulations provide that coal dust exposure can cause COPD, they do not provide that coal dust exposure always causes COPD.  In the preamble, DOL's lawyers declared that the risks of cigarette

smoking and coal dust are additive, but that statement is not embodied in any regulation and neither Dr. Rosenberg nor Vuskovich stated the risks were not additive or declared that coal dust and cigarette smoke-induced emphysema do not occur through similar mechanisms.

The ALJ thus used the preamble as a thumb on the scale of justice to find entitlement when the proof itself did not warrant it. DOL's discussion of selected court opinions and medical studies in the preamble may explain its decision to amend its regulations, but it provides no reason to credit or discredit a doctor's opinion in an individual claim. The Court of Appeals for the D. C. Circuit, the only court to see the rulemaking record, held that neither the regulations nor the preamble justified a practice of discrediting medical opinions that attributed a particular claimant's obstructive disease to cigarette smoking rather than mining. Here, though, the ALJ treated the preamble as a finding that COPD is always related to mining as a matter of law or medicine. Thus an expert who testifies that a particular miner's condition is unrelated to mining always must be discredited and a doctor, whether expert or not, who testifies that a particular miner's condition is related to mining always must be credited no matter what the basis for that opinion. This is not a proper interpretation of the preamble or the regulations.

The ALJ's decision on the cause of Helton's death also mischaracterizes the evidence and misapplies the law. In finding that the proof established that Helton's death was due to pneumoconiosis, the ALJ preferred the opinion of Helton's treating doctor. That preference has no justification in the law of this circuit or the Supreme Court, no justification in the science and no support in the record in this case. The ALJ cited no valid legal, medical or other rationale to support her preference for an admittedly flawed and unexplained opinion based on that doctor's status or to support her rejection of the contrary views expressed by pulmonary disease experts who reviewed the same information. Instead, the ALJ played

17

doctor and credited or discredited the evidence based on whether the doctors' conclusions were consistent with her views. On the merits, the awards of benefits is based on nothing and should be reversed.

## VI. ARGUMENT

### A.    Standard of Review

This Court reviews the final decision of the ALJ to determine whether it is rational, supported by substantial evidence and consistent with controlling law. Glen Coal Co. v. Seals, 147 F.3d 502, 510 (6th Cir. 1998); Kolesar v. Youghiogheny & Ohio Coal Co., 760 F.2d 728, 729 (6th Cir. 1985). The Court may not conduct a *de novo* review of the evidence, but it must review the record to ensure that the ALJ has considered all of the relevant evidence accurately and has rendered a decision that is supported, rational and complies with applicable law. The Court then considers the Board's decision to determine whether the Board committed errors of law. Eastover Mining Co. v. Williams, 338 F.3d 501 (6th Cir. 2003). An ALJ's failure to apply the correct legal standard presents a question of law over which the Court has plenary review. Arch of Kentucky, Inc. v. Director, OWCP [Hatfield], 556 F.3d 472, 477 (6th Cir. 2009).[5]

---

[5]    Although the Court in Hatfield accurately identified the standard of review in these cases, elsewhere in the opinion, the Court suggested a different standard. Hatfield, 566 F.3d at 482 ("As a remedial statute intended to benefit injured miners, the Act has always been interpreted with any ambiguity weighed in favor of miners" and "This court has long recognized that Congress intended to include as many miners under the Act as possible.") (citations omitted). The Supreme Court, however, has consistently and repeatedly prohibited this rule of construction for black lung or longshore claims. See Director, OWCP v. Greenwich Collieries, 512 U.S. 267 (1994); Morrison-Knudsen Constr. Co. v. Director, OWCP, 461 U.S. 624, 633 (1983); Potomac Elec. Power Co. v. Director, OWCP, 449 U.S. 258, 282 & n.24 (1980). Congress did not intend to compensate "as many miners as possible" and no provision of the BLBA or its relevant history supports this proposition. Congress intended to compensate miners and families who deserve benefits within the terms of the Act. When the Comptroller General of the United States reported to Congress that undeserving miners and survivors were getting benefits because of excessively generous rules, Congress amended the BLBA to bring it back into conformity with scientific principles. The notion that different rules of statutory construction or evidence apply to claimants and employers is not

B.    The ALJ Resolved Conflicts in the Record by Mischaracterizing the Evidence as well as the Conclusions in the Preamble

The APA requires an ALJ to set out his or her "findings and conclusions, and the reasons or bases therefor, on all material issues of fact, law or discretion presented on the record."  5 U.S.C. § 557(c)(3)(A).  This duty of explanation has two purposes.  First, it helps an ALJ "get it right — the exercise of writing is a great catalyst to rational thought."  Lane Hollow Coal Co. v. Director, OWCP, 137 F.3d 799, 803 (4th Cir. 1998).  Second, it allows the circuit court to discharge its own duty to review the decision.  Id.  This Court has recognized that "[a]bsent a specific, and accurate, reference to the evidence supporting an ALJ's decision, … the ALJ has failed to fulfill his duty to explain as required by § 557(c)(3)(A)" and remand is necessary for "a proper explanation."  Morehead Marine Servs., Inc. v. Washnock, 135 F.3d 366, 375 (6th Cir. 1998).  Thus in Morehead, this Court ordered remand because the ALJ stated that he relied on a doctor's observation when the record contained no evidence documenting that observation.  The ALJ's reliance on a statement that was not present in the record could not be affirmed.

The ALJ here reached a result that is not only unsupported by the record, but is prohibited by DOL's own statements in the Federal Register.  The ALJ's decision in this case is far more fiction than a reflection of either the record or the law.  The ALJ attributed opinions to certain doctors that they did not express and then relied on those opinions to find entitlement.  Dr. Clarke stated that in order to render a diagnosis, a doctor must consider more than one test, and "by a process of colligation of all the evidences for and against the diagnosis in reasoned medical judgement [sic] and in the realm of medical probability come to a decision."  Apx.

_____

only arbitrary and unsupported by the statute, it raises due process concerns, and violates the APA Act, 5 U.S.C. § 559 (prohibiting different treatment depending on the identity of the parties).

69: Cx. 5 at 2. He then concluded "that the most likely cause of these test results is the breathing of the irritants of coal mine employment" because he could "not find any other significant etiology for his disability." Id. Dr. Eubank treated Helton, but her treatment notes do not include any analysis of the cause of Helton's obstructive lung disease. The opinion she wrote for Mrs. Helton consisted of a single statement that Helton "had COLD due to CWP and Cor Pulmonale as a result of this." Apx. 144: Dx. 17-1.

According to the ALJ, "[i]n view of the consensus of medical opinion that smoking and coal dust exposure have additive effects," the opinions of Drs. Clarke and Eubank deserved "diminished weight" because they failed to address the role of Helton's smoking history. Apx. 31: ALJ D&O at 15. Normally, a doctor's failure to consider the significance of a patient's extensive smoking habit, one deemed to be "tobacco use disorder" or "nicotine addiction," by that same doctor, would require that the opinion be discredited altogether. See Greene v. King James Coal Mining, Inc., 575 F.3d 628, 636 (6th Cir. 2009); Director, OWCP v. Rowe, 710 F.2d 251 (6th Cir. 1983). See also Risher v. OWCP, 940 F.2d 327 (8th Cir. 1991). Instead, the ALJ here gave these opinions "some weight … as they were consistent with the premises underlying the regulations regarding the role of coal dust exposure in causing obstructive disease in miners." Apx. 31: ALJ D&O at 15. And, the ALJ then declared

> that despite Drs. Clark's and Eubank's failure to address the effect of smoking, and despite their lack of board certification in relevant medical specialties, their opinions are sufficient to bear the Claimant's burden of proof. Their opinions that coal dust caused the Miner's obstructive disease are consistent with the premises underlying the regulations that coal dust can cause obstructive disease even in the absence of clinical pneumoconiosis or smoking.

Apx. 31-32: ALJ D&O at 15-16.

The ALJ similarly relied on the preamble, not the actual medical opinions, to discredit the opinions of Drs. Rosenberg and Vuskovich.  Neither doctor opined that the risk of developing obstructive airways disease from coal mine dust exposure is not additive with cigarette smoking.  Neither doctor opined that COPD cannot be detected from pulmonary function studies, or that coal dust-induced and smoke-induced emphysema does not occur through similar mechanisms.[6]  The ALJ acknowledged that these two doctors were well qualified to provide opinions, but discredited them because Dr. Rosenberg's "opinion is not consistent with the premises underlying the regulations that coal dust can cause clinically significant obstructive disease even in the absence of clinical pneumoconiosis or smoking" and Dr. Vuskovich's opinion attributing Helton's obstructive disease "entirely to smoking … too, is contrary to the premises underlying the regulations, that coal dust can cause obstructive disease in the absence of clinical pneumoconiosis, and that coal dust and smoking have additive effects."  Apx. 31: ALJ D&O at 15.  She added that Dr. Rosenberg's opinion that Helton's disabling obstructive disease was due to congestive heart failure ignored that he had obstructive lung disease before he had congestive heart failure, but did not explain why this observation meant that the doctor's opinion should receive little weight.  Id.  And, Dr. Vuskovich's opinion failed because he denied that Helton had cor pulmonale when all of the cardiologists agreed that he did.  Id.

---

[6]    The "similar mechanism" phrase in the preamble was written by DOL lawyers and it is meaningless.  All foreign substances entering the lungs stimulate a protective chemical response and no ALJ is competent to either interpret the effect of that response in an individual or assess its significance to the individual's health. The response does not invariably cause disease or any permanent effect.  The ALJ is playing doctor here with no support at all.

Lemarco readily acknowledges that an ALJ has broad discretion to determine whether a doctor's report is sufficiently documented and reasoned. See Director, OWCP v. Rowe, 710 F.2d at 255. But, to make this determination, an ALJ must "examine the validity of the reasoning of a medical opinion in light of the studies conducted and the objective indications upon which the medical opinion or conclusion is based." Id. (footnote omitted). Here, there was no reasoning for the ALJ to consider in either Drs. Eubank's or Clarke's report. Neither doctor set forth any reasoning, let alone explained their opinions in light of the studies conducted or the objective indications in the record. And, neither doctor concluded that the combination or additive effects of Helton's coal dust exposure and cigarette smoking caused his obstructive lung disease. Thus the ALJ's reliance on their opinions as reasoned or documented or probative or consistent with the preamble is a bit like the Emperor's new clothes, pretending to see something that was not there.

Where the ALJ found present what was absent in the opinions of Drs. Eubank and Clarke, the ALJ found absent what was present in the opinions of Drs. Rosenberg and Vuskovich. She claimed that Dr. Vuskovich did not find that Helton had cor pulmonale by ignoring what the doctor actually said. Dr. Vuskovich defined cor pulmonale as right ventricular enlargement. Apx. 95: Ex. 2 at 12. He stated that although Helton's x-rays disclosed that he had global heart failure, they did not disclose right ventricular enlargement. Apx. 95: Ex. 2 at 12. The ALJ thus faulted the doctor's opinion based on mischaracterization of his opinion. She stated that Dr. Rosenberg ignored that Helton's obstructive disease predated his congestive heart failure, but nothing in the doctor's opinion supports this conclusion, let alone provides a basis for discrediting his opinion on that basis. Dr. Rosenberg repeatedly noted that Helton had a disabling obstructive disease, but explained that it was due to his long smoking habit. Apx. 107: Dx. 20-9.

Other than the ALJ's mischaracterization of the doctors' opinions, which is not truly debatable, all that remains is the ALJ's reliance on the preamble. It is well-established, however, that the regulations, not the preamble, provide the criteria by which a claimant's entitlement to benefits may be established. The preamble itself is not evidence and it cannot establish a claimant's entitlement. As this Court has recognized, "the preamble merely explains why the regulations were amended. It does not expand their reach." Adams, 694 F.3d at 802. The ALJ has treated the preamble as a ukase, compelling her to credit any opinion that attributes a miner's obstructive lung disease to his coal mine employment without regard to the substance of the doctor's reasoning or lack of it, without regard to the doctor's qualifications and no matter what the underlying support or lack of it. And she has interpreted the preamble as compelling her to discredit any opinion that attributes a miner's obstructive lung disease to anything other than coal mining without regard to the length and timing of the claimant's work history, or the length and timing of his smoking habit.[7]

The preamble does not support what the ALJ did here; DOL's statements in the preamble prohibit such a result. The preamble does not—and could not— indicate whether or how the conclusions of the epidemiology apply to individual cases. *See* 65 Fed. Reg. 79,939 (col. c) - 79,940 (col. a) (discussing Marine, "Clinically Important Respiratory Effects of Dust Exposure and Smoking in British Coal Miners," 137 AM. REV. OF RESPIRATORY DISEASE 106 (1988)). In that article,

---

[7]    The ALJ's decision here is distinguishable from decisions in recent cases in which this Court and others have held that an ALJ did not commit reversible error in relying on the preamble. See, e.g., Adams, 694 F.3d 798 (holding the ALJ did not err citing the preamble twice, and explicitly mentioning it once); Harman Mining Co. v. Director, OWCP [Looney], 678 F.3d 305, 314-15 (4th Cir. 2012) (resort to the preamble was not improper because the ALJ did not rely on it too much; she only consulted it).

Marine explicitly stated:  "Caution must be used in applying epidemiologic data to individuals …."  Id.  When DOL revised the definition of pneumoconiosis in its black lung regulations in December 2000, it stated that it was simply clarifying the difference between "legal" and "clinical" pneumoconiosis long recognized in the case law and in the scientific literature which showed that coal dust exposure *can* cause chronic lung disease in the absence of x-ray evidence of pneumoconiosis. The Department stated:

> The Department attempts to clarify that not all obstructive lung disease is pneumoconiosis. It remains the claimant's burden of persuasion to demonstrate that his obstructive lung disease arose out of his coal mine employment and therefore falls within the statutory definition of pneumoconiosis. The Department has concluded, however, that the prevailing view of the medical community and the substantial weight of the medical and scientific literature supports the conclusion that exposure to coal mine dust *may cause* chronic obstructive pulmonary disease.  Each miner must therefore be given the opportunity to prove that his obstructive lung disease arose out of his coal mine employment and constitutes ''legal'' pneumoconiosis.

65 Fed. Reg. 79,923 (col. b) (Dec. 20, 2000) (emphasis supplied).

The D.C. Circuit confirmed this conclusion when responding to a concern raised by the mining and insurance industries that ALJs would use the discussion in the preamble to discredit medical opinions that attributed a claimant's obstructive lung disease to cigarette smoking.  The D.C. Circuit alone saw the rulemaking record where DOL set out the medical literature it had reviewed to define pneumoconiosis in section 718.201.  *See* 65 Fed. Reg. 79,937-79,945. Much of the material was controversial and scientifically unsettled.  Some of the literature is out of date and discredited.  Almost none of the studies addressed the effects of dust on miners who, like Helton, worked exclusively after the enactment

of new federal dust standards, and smoked cigarettes for their entire adult life, continuing long after their exposure to coal dust ended.  The Court stated:

> This objection is entirely meritless. *The regulation's plain text in no way indicates that medical reports will be excluded if they conclude that a particular miner's obstructive disease was caused by smoking, rather than mining.*  Indeed, the preamble itself states that the revised definition does not alter the requirement that individual miners must demonstrate that their obstructive lung disease arose out of their work in the mines. See 65 Fed. Reg. at 79,938.

National Mining Ass'n v. Dep't of Labor, 292 F.3d 849, 862-63 (D.C. Cir. 2002) (emphasis supplied).

After the NMA decision, DOL published a new Federal Register notice, clarifying that the new definition of pneumoconiosis "'neither "expand[s]" nor "redefine[s]" the meaning of pneumoconiosis beyond its statutory definition.'" 68 Fed. Reg. 69,930 (Dec. 15, 2003), quoting NMA, 292 F.3d at 869.  DOL acknowledged that the regulation "'does not alter the requirement that individual miners must demonstrate that their obstructive lung disease arose out of their work in the mines.'"  68 Fed. Reg. 69,932, quoting NMA, 292 F.3d at 863.  And, DOL made clear, as the D.C. Circuit had found, "that the rulemaking record supports the premise that obstructive lung disease may be caused by coal mining exposure, and that this provision 'does no more than reflect this reality'" but it did not "create[] a presumption that a miner's obstructive lung disease is caused by exposure to coal dust."  Id., quoting NMA, 292 F.3d at 862-63.  Finally, DOL acknowledged that "'[t]he regulation's plain text in no way indicates that medical reports will be excluded if they conclude that a particular miner's obstructive disease was caused by smoking, rather than mining.'"  Id., quoting NMA, 292 F.3d at 863.

The ALJ here ignored these statements in the preamble.  She also ignored the D.C. Circuit's discussion of the significance of the preamble in cases like this

one, requiring doctors to sift through various risk factors to determine causation. The ALJ's preference for isolated statements in 65 Fed. Reg. rather than DOL's clarifications in 68 Fed. Reg. 69,930 following <u>NMA</u> constitutes plain error just as the ALJ's preference for isolated statements in the preamble rather than the actual opinions in the record constitutes plain error. In effect, the ALJ treated the preamble as a *de facto* exclusionary rule, regardless of—or in spite of—the doctors' explanations for their opinion. The APA does not permit this approach. 5 U.S.C. § 556(d).

Nor does the APA permit key issues in a case to be resolved, without notice to the parties, by applying legal standards derived from material in the preamble when the preamble has not been subject to notice and comment. <u>Wyeth v. Levine</u>, 555 U.S. 555, 577 (2009) (refusing to credit the FDA's statements concerning preemption in a preamble to a 2006 regulation because, among other problems, those statements were not subject to notice and comment, stating "The agency's views on state law are inherently suspect in light of this procedural failure."). Rules that have "the 'force and effect of law'" require notice and comment rulemaking. <u>Chrysler Corp. v. Brown</u>, 441 U.S. 281, 301, 302 (1979). "In enacting the APA, Congress made a judgment that notions of fairness and informed administrative decisionmaking require that agency decisions be made only after affording interested persons notice and an opportunity to comment." *Id.*, 441 U.S. at 316. <u>*See*</u> <u>also</u> <u>Camp v. Pitts</u>, 411 U.S. 138, 143 (1973) ("If [a] finding is not sustainable on the administrative record then the … decision must be vacated …."); <u>SEC v. Chenery Corp.</u>, 318 U.S. 80 (1943) (a pre-APA administrative case). It is antithetical to the structure and purpose of the APA for an agency to implement a rule first, and then seek comment later. <u>Paulsen v. Daniels</u>, 413 F.3d 999, 1004-05 (9th Cir. 2005).

Here, Lemarco requested notice of the ALJ's intention to rely on the preamble so that it could respond with proof. The ALJ ignored the request. No party can defend itself when the criteria applied by the adjudicator are not the standards announced in the regulations or where the agency changes the standard announced through litigation rather than rulemaking, especially where the criteria applied are intended to undermine the value of otherwise probative evidence. See Allentown Mack Sales & Serv., Inc. v. NLRB, 522 U.S. 359 (1998). That is what the ALJ and the Board did here.[8]

C. Mrs. Helton's Proof Is Insufficient as a Matter of Law to Establish Death Due to Pneumoconiosis

The ALJ's decision reflects a second, independent error. She applied an improper standard of causation. In order to establish entitlement in a survivor's claim, the proof must establish that the miner died due to pneumoconiosis. 30 U.S.C. § 901(a). For claims like this one, filed after January 1, 1982, DOL's regulations provide that

---

[8]    In Little David Coal Co. v. Director, OWCP [Collins], No. 11-3574 (6th Cir. July 23, 2012) (unpublished), this Court declined to consider whether notice of an ALJ's intention to consider the preamble and an opportunity to be heard was required. The Court stated that if the employer had proof that the medical and scientific support for statements in the preamble was faulty, then it had an incentive and opportunity to present that proof to the ALJ. The suggestion overlooks the facts and the law. No court, including this Court, has held that an ALJ must consider the preamble. See Adams, 694 F.3d at 802 ("the ALJ was not required to look at the preamble to assess the doctors' credibility" although he was entitled to do so). See also Gunderson v. Blue Mountain Energy, No. 11-0668 BLA (Ben. Rev. Bd. July 30, 2012) ("There is no merit to claimant's assertion that an administrative law judge is required to determine the credibility of an expert's opinion in light of the preamble to the revised regulations."). Moreover, the Federal Register notice that includes the preamble is 188 pages long. No party should have to guess whether an ALJ will chose to rely on the preamble and if so, what sections he or she will find relevant so that it can challenge those statements.

death will be considered to be due to pneumoconiosis if any of the following criteria is met:

> (1) Where competent medical evidence establishes that pneumoconiosis was the cause of the miner's death, or

> (2) Where pneumoconiosis was a substantially contributing cause or factor leading to the miner's death or where the death was caused by complications of pneumoconiosis, or

> (3) Where the presumption set forth at §718.304 is applicable.

> (4) However, survivors are not eligible for benefits where the miner's death was caused by a traumatic injury or the principal cause of death was a medical condition not related to pneumoconiosis, unless the evidence establishes that pneumoconiosis was a substantially contributing cause of death.

> (5) Pneumoconiosis is a "substantially contributing cause" of a miner's death if it hastens the miner's death.

20 C.F.R. § 718.205(c). Other than a presumption invoked by proof of complicated pneumoconiosis (section 718.304), not applicable here, the Act contains no presumptions, special rules of proof or other provisions defining this substantive eligibility requirement.

This Court has twice articulated the standard of proof under section 718.205(c). Conley v. National Mines Corp., 595 F.3d 297 (6th Cir. 2010); Eastover Mining Co. v. Williams, 338 F.3d 501. In Williams, the Court held that "[l]egal pneumoconiosis only 'hastens' a death if it does so through a specifically defined process that reduces the miner's life by an estimable time." Williams, 338 F.3d at 518. The Court reversed an award of benefits in which the ALJ relied on a opinion by a miner's treating doctor, finding it both "conclusory" and "inadequate" because the doctor just asserted that because the miner had pneumoconiosis, the disease must have hastened his death. Id. The Court also faulted the ALJ for ignoring the doctor's lack of special expertise, adding that the treating doctor "has

no board certification in pulmonary medicine, but the ALJ accepted [his] assertion that a coal dust-related ailment contributed to the miner's demise over the opinions of two board-certified pulmonary specialists who reached the opposite conclusion." Id.

In Conley, the Court again addressed the standard of proof in a case involving a heavy cigarette smoker deemed to have both clinical and legal pneumoconiosis. The claimant relied on an opinion of a treating doctor who was not a pulmonary disease specialist, but who concluded that the miner's death was hastened by legal pneumoconiosis (COPD) because his lack of respiratory reserve made it less likely that he could survive the lung cancer that was the principal cause of death. The ALJ relied on that opinion, finding it was based on objective medical evidence and supported by his treatment and hospitalization notes and familiarity with the miner based on his lengthy treatment. Conley, 595 F.3d at 300. The ALJ rejected two opinions from pulmonary disease specialists that Mr. Conley's obstructive lung disease was wholly due to his cigarette smoking rather than coal mining, but in any event, his death occurred as and when it did regardless of his coal mine employment. Id. In Conley, the Benefits Review Board reversed the ALJ's decision and this Court affirmed the Board's decision. The Court confirmed that "a conclusory, unsupported opinion … is insufficient to support the determination that [a miner's] legal pneumoconiosis hastened his death." Conley, 595 F.3d at 303. The Court explained:

> There is some room for argument, we acknowledge, about what it means to hasten death "by an estimable time." Does that mean that every medical opinion must quantify a precise number of days by which pneumoconiosis hastens death? Will an estimate of months suffice? Of years? Or will a range of any of the above do the trick? And what if for a medically legitimate reason an estimate cannot be made? We believe that, as is so

29

frequently true when it comes to the application of a legal principal, context and common sense will govern the resolution of these questions. For instance, the "estimable time" language employed in *Eastover Mining* does not exist in a vacuum; it follows upon the heels of the requirement that legal pneumoconiosis be shown by medical opinion to hasten death "through a specifically defined process." A conclusory medical opinion, in other words, will not suffice. Neither an opinion, like Dr. Potter's, that addresses the issue at such a high level of generality—"the healthier we are, the better we're able to deal with serious problems"—that it amounts to nothing more than a conclusion. A medical opinion that pneumoconiosis expedited death through a "specifically defined process" must explain why that is so and generally should be able to explain how and to what extent—customarily through a range of time—that process hastened a specific patient's death. In that regard, it bears emphasis that every death, like every person, is different. More precision may legitimately be expected when it comes to the relationship of legal pneumoconiosis to some primary illnesses than to others.

Conley, 595 F.3d at 303-04.

The ALJ noted the holdings of this Court in Williams, but did not apply it when it came to her assessment of Dr. Eubank's opinion. Nor could she. Dr. Eubank did not give the ALJ anything to work with here. She wrote a note several months after Helton's death "to whom it may concern" that Helton had "CWP which caused Cor Pulmonale and CHF leading to his demise." Apx. 141: Dx. 19-34. That single conclusory sentence does not satisfy the standard articulated in Williams or Conley. The letter Dr. Eubank wrote "to whom it may concern" declaring that Helton "had COLD due to CWP and Cor Pulmonale as a result of this which caused Cardiomyopathy and Congestive heart failure leading to his death" similarly does not supply the missing explanation. Apx. 71: Dx. 17-1.

Wholly apart from its linguistic challenges, this declaration fails to comply with any accepted scientific method or measure of reliability. See Best v. Lowe's

30

Home Ctrs., Inc., 563 F.3d 171, 179 (6th Cir. 2009) (adopting a test for reliability of differential diagnoses that meets a certain level of "methodological rigor"); Guinn v. AstraZeneca Pharms. LP, 602 F.3d 1245, 1253 (11th Cir. 2010) (confirming that a reliable opinion on causation "must at least consider other factors that could have been the sole cause of the plaintiff's injury"); Westberry v. Gislaved Gummi AB, 178 F.3d 257, 265 (4th Cir. 1999) ("differential diagnosis that fails to take serious account of other potential causes may be so lacking that it cannot provide a reliable basis for an opinion on causation"); In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 759 (3d Cir. 1994) ("[A]t the core of differential diagnosis is a requirement that experts at least consider alternative causes—that almost has to be true of any technique that tries to find a cause of something."). And the courts agree that an expert must then explain why he or she has concluded that the alternatives causes are not the sole cause of an injury. Guinn, 602 F.3d at 1253 (collecting cases).[9] The failure to consider other causes, as well as a doctor's

---

[9] These decisions implement the requirement for admissibility of expert testimony under Fed. R. Evid. 702 announced in Daubert v. Merrill Dow Pharmaceuticals, Inc., 509 U.S. 579, 593 (1993). Although the Federal Rules of Evidence do not apply in black lung adjudications, minimum standards of reliability and relevance apply to adjudications under the Administrative Procedure Act. See Niam v. Ashcroft, 354 F.3d 652, 660 (7th Cir. 2004) (recognizing that "the spirit of Daubert ... does apply to administrative proceedings….  "Junk science" has no more place in administrative proceedings than in judicial ones." (citations omitted)); Jarrell, 187 F.3d at 388-89 ("But even though the more stringent exclusionary rules of evidence, which are generally applicable to jury trials, are not justified in agency proceedings, the agency process nonetheless requires that the ALJ perform a gatekeeping function while assessing evidence to decide the merits of a claim. To assure both a fairness in the process and an outcome consistent with the underlying statutory scheme, the ALJ has, under § 556(d) of the Administrative Procedure Act, the affirmative duty to qualify evidence as 'reliable, probative, and substantial' before relying upon it to grant or deny a claim. … Absent such a discipline to qualify evidence, administrative findings and orders could unacceptably rest on suspicions, surmise, and

reliance on anecdotal evidence, improper extrapolation, lack of testing or objectivity are "red flags" that caution against accepting a doctor's opinion.  See Best, 563 F.3d at 177.   The fact that the expert's opinion was prepared for litigation may also be considered as a basis for exclusion.  Johnson v. Manitowoc Boom Trucks, Inc., 484 F.3d 426, 434 (6th Cir. 2007); Williams, 338 F.3d at 511, 517.

The ALJ nevertheless declared that Dr. Eubank's opinion was supported by "the evidence in the record that the condition of the Miner's lungs contributed to his congestive heart failure and cor pulmolnale, in addition to the treatment records which show a totally disabling respiratory impairment during the Miner's lifetime."  Apx. 33: ALJ D&O at 17.  The ALJ does not identify what this evidence is.   The only specific evidence she referred to was the death certificate, as supported by "the weight of the hospital records," naming the views of Drs. Qazi, Rahman, and Saleh, who "each opined that the Miner suffered from congestive heart failure and cor pulmonale."  Id.

This evidence does not supply the reasoning missing from Dr. Eubank's opinion.  A statement on a death certificate is neither a reasoned medical opinion nor support for a doctor's opinion.  See Lango v. Director, OWCP, 104 F.3d 573, 577 (3d Cir. 1997) ("The mere statement of a conclusion by a physician, without any explanation of the basis for that statement, does not take the place of the required reasoning."); Bill Branch Coal Corp. v. Sparks, 213 F.3d 186, 192 (4th Cir. 2000) ("The death certificate indicates that Dr. Stefanini believed that pneumoconiosis contributed to Mr. Sparks's death, but Dr. Stefanini's failure to offer some reasoning for this view renders his bald conclusion insufficient to

speculation.").  See also Paul S. Miller & Bert W. Rein, "'Gatekeeping' Agency Reliance on Scientific and Technical Materials After Daubert: Ensuring Relevance and Reliability in the Administrative Process," 17 TOURO L.REV. 297 (2000).

support the ALJ's finding."); <u>Freeman United Coal Mining Co. v. Stone</u>, 957 F.2d 360, 362-63 (7th Cir. 1992) (reversing award of benefits that relied on a death certificate, finding a death certificate was not substantial evidence); <u>Risher v. OWCP</u>, 940 F.2d 327, 331 (8th Cir.1991) ("[W]e do not believe that Dr. Ahmad's reference to black lung on the death certificate, without more, constitutes the reasoned medical finding required by the regulation.").

Nor do the opinions of the cardiologists (Drs. Qazi, Rahman or Saleh) provide the explanation that is missing from Dr. Eubanks' opinion.  None of them diagnosed legal pneumoconiosis or concluded that Helton's death was due in any way to coal dust exposure.  Drs. Qazi and Rahman reported that Helton had renal failure, hyponatremia, hyperkalemia, liver problems, congestive heart failure and COPD.  Apx. 162: Dx. 14-178.  In June 2004, Dr. Qazi also diagnosed ethanol induced cardiomyopathy, degenerative joint disease, congestive heart failure and hepatitis C, but again, he did not relate any of these conditions to Helton's remote coal dust exposure.  Apx. 148: Dx. 16-6.  Dr. Rahman reported only possible cor pulmonale.  Apx. 162: Dx. 14-178.  Dr. Saleh concluded that Helton had cardiomyopathy and "probably significant cor pulmonale."  Apx. 157: Dx. 15-99.  But Dr. Saleh specifically attributed Helton's COPD to his forty-five years of cigarette smoking.  Apx. 160: Dx. 15-102.  The ALJ does not—and cannot—point to anything in the treatment notes to support Dr. Eubank's conclusory letter.  The opinion is neither reasoned nor documented as a matter of fact or law.  Nor is the death certificate a reasoned and documented opinion as a matter of law.  No matter what else is included in the record, the opinion of Dr. Eubank and the death certificate are not sufficient.

Here, though, the ALJ erred when she discredited the opinions of Drs. Rosenberg for neglecting to mention Dr. Rahman's finding of hyponatremia secondary to congestive heart failure.   Apx. 33: ALJ D&O at 17.   She

mischaracterized both opinions.    Dr. Rahman did not find that Helton's hyponatremia was due to congestive heart failure, he said it could be due to congestive heart failure.   Apx. 162: Dx. 14-178.   That something is possible is not substantial evidence of causation.    See U.S. Steel Mining Co., Inc. v. Director, OWCP [Jarrell], 187 F.3d 384 (4th Cir. 1999).    But, here, the possibility that Helton's hyponatremia was due to congestive heart failure does not establish that it had anything to do with Helton's COPD or his coal dust exposure.[10]    Moreover, Dr. Rosenberg did not ignore the finding of hyponatremia.    He specifically

---

[10]      It is possible that the ALJ was referring to Dr. Halukurike, who assessed Helton for renal failure.  Apx. 153: Dx. 15-94.  But Dr. Halukurike did not opine that Helton's hyponatremia was secondary to his congestive heart failure.   He stated it was "hyponatremia, which he related to "combination of hypovolemic state with congestive heart failure, along with increased forward flow, having high ADH levels,… worsened by the Maxzide combination" and added: "The diuretics have an increased propensity to cause hyponatremia."  Apx. 155: Dx. 15-96.  Dr. Halukurike stated that Helton had "Chronic obstructive pulmonary disease vs. congestive heart failure vs. cor pulmonale exacerbation at this point causing shortness of breath."  Id.   Dr. Rosenberg did not overlook anything in Dr. Halukurike's opinion and if he did, there is nothing in the record to suggest that such an oversight required the ALJ to discredit the doctor's opinion.  The ALJ thus both mischaracterized the record and substituted her opinion for the experts.  Either constitutes legal error.  See Clifford v. Apfel, 227 F.3d 863, 870 (7th Cir. 2000) ("an ALJ must not substitute his own judgment for a physician's opinion without relying on other medical evidence or authority in the record."); Rohan v. Chater, 98 F.3d 966, 968 (7th Cir. 1996) ("[A]s this Court has counseled on many occasions, ALJs must not succumb to the temptation to play doctor and make their own independent medical findings."); Meece v. Barnhart, 192 Fed. App'x. 456, 465 (6th Cir. 2006) ("[T]he ALJ may not substitute his own medical judgment for that of the treating physician where the opinion of the treating physician is supported by the medical evidence.") (citing McCain v. Director, OWCP, 58 Fed. App'x 184, 193 (6th Cir. 2003) (citation omitted)); Pietrunti v. Director, OWCP, 119 F.3d 1035, 1044 (2d Cir. 1997); Walker v. Director, OWCP, 927 F.2d 181, 184 n.4 (4th Cir. 1991) ("an ALJ cannot substitute his or her opinion for that of a physician.").

commented on the existence of the condition.  Apx. 105: Dx. 20-7.  But he did not find that it suggested that it or coal dust exposure influenced Helton's death.

The ALJ's treatment of Dr. Vuskovich's opinion discloses a similar mischaracterization of the record.  She faulted his conclusion because he did not diagnose cor pulmonale when the cardiologists who treated Helton concluded that Helton had cor pulmonale and congestive heart failure.  Apx. 33: ALJ  D&O at 17.  The ALJ overlooked what Dr. Vuskovich said.  He defined cor pulmonale as right ventricular enlargement and thus concluded that Helton did not have cor pulmonale because his heart disease started on the left side.  Apx. 93, 95: Ex. 2 at 10, 12.  This conclusion is supported by the treatment records.  Apx. 143, 161.  The ALJ seems to lump together all cardiac diagnoses and then concludes that if one is related to lung disease, all are related to lung disease.  The record does not support this conclusion.

DOL's regulations were intended to restrict the number of survivor's claims awarded.  See 65 Fed. Reg. at 79949-51.  The Director stated that "the claims adjudication process . . . requires the claimant to submit credible medical evidence establishing a detectable hastening of the miner's death on account of pneumoconiosis." 65 Fed. Reg. at 79949, col. (a)-(b). Thus, in order to establish death causation, the evidence must prove "pneumoconiosis actually hastened the miner's death." Id. at 79949, col. (b).  The medical literature establishes that complicated pneumoconiosis or progressive massive fibrosis (not present in Helton's case) may influence a patient's death, but there was no consensus and no medical research supporting the speculation that simple or legal coal workers' pneumoconiosis is associated with premature mortality. Id. at 79950-51.  There is no medical evidence in this record that established that Helton's pneumoconiosis caused his death and in the absence of such proof, the claim should be denied.  All that supports the award here is the ALJ's misreading of the record.  Without an

accurate account of the evidence, the ALJ has failed to satisfy her obligations under the APA.    Morehead Marine Servs. v. Washnock, 135 F.3d at 375.  The Court should remand for this reason.

## VII.  CONCLUSION

The decision and order of the Benefits Review Board denying reconsideration and affirming the award of benefits in this case should be reversed.

Respectfully submitted,

s/Mark E. Solomons
Mark E. Solomons
Laura Metcoff Klaus
GREENBERG TRAURIG LLP
2101 L Street, N.W., Suite 1000
Washington, D.C. 20037
(202) 533-2361

<u>CERTIFICATION OF COUNSEL</u>

As required by Fed. R. App. P. 32(a)(7)(C), I certify that this brief is proportionally spaced and contains 11,718 words (exclusive of the cover, table of contents and table of authorities).  I relied on my word processor to obtain the count, using Microsoft Word 2010.

In addition, this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in Times New Roman, 14 pt.

s/Laura Metcoff Klaus
Laura Metcoff Klaus

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 22, 2009, a copy of the foregoing Petitioners' Brief was served on the following party through the CM/ECF system:

Jeffrey S. Goldberg Esq.
blls-sol@dol.gov; Goldberg.jeffrey@dol.gov

and on the following party by U.S. mail, first class, postage prepaid:

John C. Carter, Esq.
Carter & Busroe
112 W. Central Street
P. O. Drawer 778
Harlan, Kentucky  40831-0000

s/Laura Metcoff Klaus
Laura Metcoff Klaus